Maureen J. Shanahan 102222
Totaro & Shanahan, LLP
P.O. Box 789
Pacific Palisades, CA 90272
(310) 804-2157 (v)
(310) 496-1260 (f)
Mstotaro@aol.com

Martin Simone, Esq. (SBN 51584)
SIMONE & ROOS LLP
5627 Sepulveda Blvd Ste 206
Van Nuys, CA 91411
Phone Number: (818) 788-1914
Fax Number: (818) 787-1960
E-mail: martin@frankandsimonelaw.com

Attorneys for Plaintiffs

CHANTILLY ROAD, LLC, a California limited liability company; LEVIATHAN, LLC, a California limited liability company; THE KRAKEN, LLC, a California limited liability company ADRIAN RUDOMIN, an individual; DIEGO RUDOMIN, an individual; PABLO RUDOMIN, an individual; ISAAC RUDOMIN, an individual.

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA - Santa Ana Division

| | |
|---|---|
| In re<br><br>CHANTILLY ROAD LLC,<br><br>        Debtor. | Case No.: 8:24-bk-13197-TA<br><br>Adversary No:<br><br>Chapter 11 |
| CHANTILLY ROAD, LLC, a California limited liability company; LEVIATHAN, LLC, a California limited liability company; THE KRAKEN, LLC, a California limited liability company; ADRIAN RUDOMIN, an individual; DIEGO RUDOMIN, an individual; PABLO RUDOMIN, an individual; ISAAC RUDOMIN, an individual,<br><br>        Plaintiffs.<br><br>V.<br><br>CSPRF 2 LLC, a Delaware limited liability company; CAPSTACK PARTNERS LLC, a Delaware limited liability company; DAVID BLATT, an individual; and DOES 1 through 10, inclusive,<br><br>        Defendants. | **COMPLAINT FOR:**<br>1. **Breach of Contract**<br>2. **Usury in the Note (California Constitution, Article XV, Section 1, and Civil Code Section 1916-1 et seq.);**<br>3. **Usury and Breach of Contract in the Forbearances;**<br>4. **Unconscionable Forbearances (California Civil Code Section 1670.5(2));**<br>5. **Deficient Foreclosure Notices;**<br>6. **Fraud in the Execution;**<br>7. **Lack of Mutual Assent;**<br>8. **Failure to Comply with Commercial Reasonableness;**<br>9. **Failure to Register to do Business in California;**<br>10. **Intentional Interference with Prospective Economic Advantage, and;**<br>11. **Declaratory Relief.** |

**TO THE HONORABLE THEODORE ALBERT, UNITED STATES BANKRUPTCY JUDGE,**

**ALL INTERESTED PARTIES AND THEIR ATTORNEYS OF RECORD;**

### JURISDICTION AND VENUE

1. This Court has jurisdiction over the parties and subject matter of this proceeding pursuant to 28 U.S.C. §§ 157 and 1334. This action is commenced pursuant to 11 U.S.C. Sections 362(a)(3), 549 and 550. and Rules 7001(1) and (9) of the Federal Rules of Bankruptcy Procedure. This Court may hear and determine this proceeding and enter appropriate orders and judgments pursuant to 28 U.S.C. § 157(b)(1) and (2). This proceeding relates to Case No. 8:24-bk-13197-TA, styled In re Chantilly Road LLC (the "Bankruptcy"), initiated by Debtor Chantilly Road, LLC ("Plaintiff" or the "Debtor"), and is a core proceeding as set forth in 28 U.S.C. §§ 157(b)(1) and (2)(A) (B) (K) and (O) in that it seeks to invalidate or disallow portions of a scheduled claim in the Bankruptcy which are usurious under California law, and to determine the validity and extent of the lien upon which that claim is based, which affect the debtor-creditor or equity security holder relationship of the Debtor and Defendant, and affects the administration and liquidation of assets of the Debtor's bankruptcy estate (the "Estate"). Pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure, Plaintiff hereby consents to the entry of final orders or judgment by the Court. Additionally, pursuant to Local Bankruptcy Rule 7008-1, if the Court determines this proceeding is a core proceeding, Plaintiff hereby consents to the entry of final orders or judgment by the Court.

### INTRODUCTION

2. Plaintiffs CHANTILLY ROAD, LLC ("Chantilly"), a California limited liability company, LEVIATHAN, LLC ("Leviathan"), a California limited liability company, THE KRAKEN, LLC ("Kraken"), a California limited liability company, ADRIAN RUDOMIN, an individual, DIEGO RUDOMIN, an individual, PABLO RUDOMIN, an individual, ISAAC RUDOMIN, an individual,  (collectively "Plaintiffs"), bring this action against Defendants CSPRF 2 LLC, Capstack Partners LLC and David Blatt  (collectively "Defendant") for breach of contract, engaging in usurious, unconscionable, and unlawful practices, disregarding California statutory

protections for borrowers, fraud in the execution, lack of mutual assent, failing to comply with commercial reasonableness, and illegally attempting to take over the ownership, equity, assets and management of Leviathan LLC and Chantilly Road LLC, with the intent to irreversibly disenfranchise Plaintiffs, equity holders and third-party unsecured creditors for the sole purpose of Defendant's unjust enrichment.

**PARTIES**

3.   Plaintiff Chantilly Road, LLC, ("Chantilly") is a California limited liability company, duly formed and existing and with its principal place of business in Orange County, California. At the relevant times alleged herein, Chantilly is or was the sole owner of the real estate property located at 1116-1118 Chantilly Road, Los Angeles, CA 90077 ("The Property").

4.   Plaintiff Leviathan LLC ("Leviathan") is a California limited liability company, duly formed and existing and doing business in Los Angeles and Orange County, California. At relevant times alleged herein, Leviathan is or was the sole owner of Chantilly.

5.   Plaintiff The Kraken LLC ("Kraken") is a California limited liability company, duly formed and existing and doing business in Los Angeles and Orange County, California. At the relevant times alleged herein, Kraken is or was a member and manager of Leviathan and the sole manager of Chantilly.

6.   Plaintiffs Adrian Rudomin and Diego Rudomin are individuals residing in California, and at the relevant times alleged herein, individually and collectively are or were members of Leviathan and members and managers of Kraken.

7.   Plaintiffs Pablo Rudomin and Isaac Rudomin are individuals residing in the country of Mexico, and at relevant times alleged herein, individually and collectively are or were members of Leviathan and Kraken.

8.   Plaintiffs Adrian Rudomin, Diego Rudomin, Isaac Rudomin, Pablo Rudomin (the "Rudomins") and Kraken shall be hereinafter collectively referred to as "Owners" when referring to their membership and ownership of Leviathan.

9. Defendants CSPRF 2 LLC and CapStack Partners LLC are Delaware limited liability companies operating as CapStack, engaged in providing loans and other financial services, including in California.

10. Defendant David Blatt is an individual, and on information and belief is a resident of New York and has acted in California in furtherance of the actions alleged herein. Plaintiffs are informed and believe and thereon allege that David Blatt is the primary owner and/or CEO and responsible managing member of CAPSTACK PARNERS LLC and CSPRF 2 LLC.

11. Plaintiffs are informed and believe and thereon allege that neither CapStack Partners LLC nor CSPRF 2 LLC are registered with the California Secretary of State as foreign corporations authorized to do business in California.

12. CSPRF 2 LLC, CapStack Partners LLC, and David Blatt are hereinafter referred to jointly as "Defendant".

13. Plaintiffs are unaware of the true names and capacities of defendants sued herein as DOES 1 through 10, inclusive, and therefore sue these defendants by such fictitious names.

## FACTUAL BACKGROUND & GENERAL ALLEGATIONS

14. Plaintiffs incorporate by reference paragraphs 1 through 13 as though fully set forth herein.

15. In January 2013, with the financial support of their family, the Rudomins formed Leviathan as a family entity to develop real estate as a source of income. The business structure included the formation of Kraken as a management entity while Leviathan would hold the assets. On the recommendation of counsel, it was decided that each property would be held in a single-purpose entity owned by Leviathan. This led to the formation of Chantilly when the Property was purchased in 2018 as an empty lot with the intent to design and develop a beautiful modern estate that upon sale would hopefully provide resources and stability for the family.

16. As outlined in the Parties, Chantilly/Debtor is owned by Leviathan whose members are the Owners. Kraken is the sole manager of Leviathan and Adrian and Diego are the managers of Kraken, which is in turn the sole manager of Chantilly.

17. The development of the Property unfortunately faced many challenges. In addition to the normal difficulties faced by any construction, the Property suffered significant delays due to

events outside of Plaintiffs' control, including work stoppages caused by the Covid-19 pandemic, supply chain issues, weather conditions, delays in the city permitting process, and unprecedented increases in the cost of building materials and labor. These issues and other challenges severely depleted Plaintiffs' resources, resulting in the need for increased outside funding.

18. On or about August 2023, Plaintiffs were introduced to David Blatt, the CEO of CapStack Partners, and entered negotiations for a second loan that would provide Chantilly with the time and much-needed capital to finalize and market the Property for sale. The first loan with a principal of $15,105,000 is held by Civic Financial Services/Banc of California (the "First"). Plaintiffs' initial contact and all dealings for the second loan were with David Blatt, CapStack Partners, and Defendant's law firm for the loan, Kriss & Feuerstein, LLP. The Letter of Intent for the loan was issued by CapStack Partners. However, the Loan documents themselves were made under an affiliate or subsidiary previously unknown to Plaintiff named CSPRF 2, LLC.

19. Both CapStack and CSPRF 2, LLC are Delaware limited liability companies with their principal place of business in Florida, however neither entity is registered with the California Secretary of State as a foreign corporation authorized to do business in California, in violation of California Corporations Code § 2105. Defendant has no agent for service of process in California, one of the requirements of registration by foreign entities who do business in California. Defendant is not a licensed real estate broker, does not hold a California Finance Lenders License, and does not in any other way qualify as a lender exempt from California usury laws.

20. Critical to this case and the validity of the actions taken by CapStack is an understanding of the lending process of this loan. Prior to entering the loan, Defendant had provided Plaintiffs only with a compressed folder of the draft loan documents in Microsoft Word document format. These documents were extremely lengthy, constituting hundreds of pages and were clearly not the final version as the format could be easily edited.

21. On or about November 15, 2023, Plaintiffs received an email from Defendant's counsel which was also sent to Old Republic Title and Escrow ("Title and Escrow") and other interested parties. The email had two attachments, both of which contained only the signature pages that

were needed for the loan documents, deed of trust, and all the security instruments together with cover sheets and notary pages. None of the loan documents or terms were included in this package. Plaintiff, Title, and Escrow requested that Defendant send the final loan documents, but Defendant's counsel replied that Defendant required Plaintiffs' signed and notarized signature pages before funding the loan, and that they would only have the final loan documents on the date of closing. This implied that any loan documents Plaintiffs read prior to signing were not the final loan documents, and that the documents were changed after Plaintiff signed and notarized their signature pages.

22. Plaintiffs required the Loan to prevent the First from entering into default and prevent the Property from entering a state of distress which would potentially reduce its value. As time was of the essence, Plaintiffs felt they had no choice but to proceed.

23. Thus, on or about November 16, 2023, per Defendants' demand, Plaintiffs signed and notarized the signature pages for a $2.35 million loan with Defendant (the "Loan") without having access to the final version of the complete Loan package. The signature packages, complete with notarization, were returned to Title and Escrow who then sent to Defendant's counsel.

24. The Loan closed on or about November 20, 2023. The Loan was secured by a note (the "Note"), a deed of trust on the Property (the "Deed of Trust"), personal guaranties by the Rudomins (the "Guaranties"), and pledges by the Owners of their respective membership interests in Leviathan (the "Pledged Interests").

25. Of importance is the fact that even after closing the Loan, Plaintiffs were never provided with a complete set of the final Loan documents. Plaintiffs furthermore contacted Title and Escrow to request a complete set only to be informed that they had not received the complete set loan documents either; only the signature packages and recordable document (Deed of Trust).

26. Thankfully, Defendant provided the complete set of Loan documents as exhibits in their Motion to Dismiss, certifying them to be "true and correct" copies of the executed agreement. The Loan documents assist in Plaintiffs establishing Defendant's breach of contract, misrepresentation, bad faith, deficient notices of sale and payoff demands, possible fraud on the Court, and evidence of a commercially unreasonable UCC sale that can be voided among other issues.

A copy of the Note verified to be "true and correct" by Defendant David Blatt in his Declaration supporting Defendants' Motion to Dismiss Chantilly's Chapter 11 bankruptcy is attached hereto as Exhibit 1.

27. The basic terms of the Note as negotiated and agreed upon were as follows:

    a.  An origination fee (the "Origination Fee") of $117,500, amounting to 5% of the principal. (Exhibit 1, Section 7)

    b.  An initial interest rate (the "Interest Rate") defined as the greater of the "floor rate" of 20% per annum, or the "spread" of 11.50% plus the "prime rate" as published in the WSJ. As the highest prime rate during the Loan Term was 8.5% per annum, the maximum interest rate possible per the Note was 20% per annum. (Exhibit 1, Sections 1e, g, n, p)

    c.  Interest rate in event of default (the "Default Interest Rate") defined as 10% above the applicable Interest Rate. Based on the above, the maximum default interest rate possible per the Note was 30% per annum. (Exhibit 1, Section 12)

28. Per the California Constitution, Article XV, Section 1 these terms would be usurious. The cooperation of a licensed CA real estate broker was used to qualify the Loan for exemption.

29. Despite the Note stipulating the specific terms outlined above, the actual amounts charged and sought by Defendant exceeded the terms of the Loan.

A copy of Defendant's Loan Settlement Statement and the Escrow Final Settlement Statement are attached hereto as Exhibits 2 and 3, respectively.

    a.  Defendant's Loan Settlement Statement (Exhibit 2) and the Escrow Final Settlement Statement (Exhibit 3) show that Defendant collected an origination fee of $141,000. This constitutes 6% of the loan principal, instead of the contractual 5% Origination Fee.

    b.  Defendant's Loan Settlement Statement (Exhibit 2) and the Escrow Final Settlement Statement (Exhibit 3) show that Defendant collected interest payments through escrow of $403,547.22. Over the term of the Loan, this constituted an effective interest rate of approximately 24.55% per annum, instead of the contractual maximum 20% Interest Rate.

    c.   Since the Loan's maturity date, Defendant has claimed default interest rates calculated to be approximately 32.44% to 36.05% depending on the version of Defendant's payoff demand.

30.   These amounts charged by Defendant through escrow at the close of the Loan were significantly higher than negotiated and stipulated in the Note, thus breaching the Loan.

31.   As Plaintiffs did not have in their possession a complete set of the final Loan Documents, Plaintiffs were unable to accurately verify whether these were the correct amounts. Plaintiffs did not see a complete copy of the Loan Documents until the Defendant filed their Motion to Dismiss Chantilly's Chapter 11 bankruptcy petition, wherein they included a "true and correct copy" of the Loan Documents, including the Note, the Deed of Trust, the Guaranties, and the Pledged Interests.

32.   The Property has since been completed and was being marketed. However, the Los Angeles luxury market unfortunately has faced significant slow-downs, and Plaintiffs were unable to sell the Property within the term of the Loan.

33.   Knowing that the Property was facing a difficult market to sell prior to the Loan maturing, Plaintiffs had been working diligently to obtain a new Loan that would pay off the Defendant and the First, thus buying more time to sell the Property. Plaintiffs diligently communicated their progress both in the refinance efforts and in Property marketing efforts with Defendant.

34.   On or about August 1, 2024, the Loan matured. Defendant had previously verbally assured Plaintiffs that they intended to support Plaintiffs and allow them the time required to sell or refinance the Property and pay Defendant what they were owed, despite the Loan maturing. Regardless of these representations, on August 2, 2024, the day after the loan matured, Defendant accelerated the default process by placing a Notice of Default.

35.   On or about August 20, 2024, Defendant further accelerated the default process by filing a notice of UCC foreclosure sale of the Pledged Interests for October 5, 2024. This signified that Defendant intended to take over and completely cut out Plaintiffs' interests in the Property that the family had worked tirelessly for several years to build.

36. Subsequently to filing the notice of UCC foreclosure sale, Defendant used the threat of this sale of the Pledged Interests to arrange four separate forbearance agreements (the "Forbearances") with Plaintiffs. These Forbearances were arranged without utilizing a California licensed real estate or finance broker, in violation of California Civil Code § 1916.1.

37. The Forbearances are: the first Forbearance Agreement dated October 2, 2024; the second Forbearance Agreement dated November 1, 2024; the third Forbearance Agreement dated November 14 2024; and the fourth Forbearance Agreement dated November 25, 2024. A copy of each Forbearance Agreement is attached hereto as Exhibits 4-7, respectively.

38. The Forbearances provided a total of approximately 60 days of forbearance, delaying only the UCC foreclosure sale of the Pledged Interests. Over the course of these two months of Forbearances, Defendant demanded and collected from Plaintiffs approximately $442,670 in fees which equates to an interest rate of approximately 114.59% per annum. This would have been sufficient to cover 11 months of the Interest Rate stipulated in the Note.

39. Not only are these fees usurious, but they also constitute an impermissible penalty and hidden interest.

40. Defendant elected to collect these fees totaling approximately 19% of the principal of the loan while having full knowledge of Plaintiff's hardship and of the fact that Plaintiffs was actively seeking to either sell the Property or secure a new loan to pay Defendant back in full.

41. In addition to these excessive and usurious fees, Defendant indicated in the Forbearances that the Loan continued to accrue default interest at a per diem rate of $2,088.89 which constitutes a rate of approximately 32.44%. As outlined above, the maximum Default Interest Rate allowed per the Note was 30%, thus the default rate sought in these Forbearances constitute another breach of the Note by Defendant.

42. These Forbearances depleted Plaintiffs' resources, leaving Plaintiffs unable to pay the excessive fees Defendant continued to demand for any further forbearance.

43. On or about November 22, 2024, the Defendant filed a notice of foreclosure sale of the Deed of Trust with a sale date of December 17, 2024.

44. It must be noted that due to Defendant's breaches of the Note, Plaintiffs' and Chantilly's total indebtedness to Defendant, including all points, interest and default interest, has been improperly calculated as Defendant charged far more than is stipulated and legally permitted in the Note. Thus, the amounts stated in all of Defendant's UCC and deed of trust foreclosure sale notices improperly reflect the true and accurate obligations of Chantilly and Plaintiff debt to Defendant, reflecting an inflated amount as the Defendant charged and collected more than was legally permitted. As such, Defendant's notices are deficient and invalid because they claim more debt than is owed.

45. Since default interest continues to accrue and the default interest rate Defendant has demanded in their Payoff Demands and Forbearances is higher than what is permitted in the Note, the discrepancy between Plaintiff's actual true debt and the debt claimed in Defendant's notices continues to increase. Any further notice of sale or payoff demand thus would have a larger discrepancy than the previous one.

46. On or about December 15, 2024, Chantilly filed for Chapter 11 bankruptcy in an attempt to protect the Property from foreclosure both from the First and from Defendant, following its fiduciary obligation to protect the interests of all creditors and equity holders.

47. Plaintiffs assert that Kraken, and therefore Adrian and Diego Rudomin, at the time of Chantilly's voluntary Chapter 11 bankruptcy petition were and continue to be authorized to act as Chantilly's sole manager.

48. On or about December 19, 2024, Defendant claimed they had proceeded with the UCC sale of the Pledged Interests, purchasing the Pledged Interests at their own auction for $1,000.00. Defendant claimed that they had taken over ownership of Leviathan on December 4, 2024 and amended its operating agreement to appoint David Blatt as the manager that same day.

49. Contrary to Defendant's claims, it must be noted that prior to this date, Defendant had made no such claim. In fact, Defendant had continued the status quo of Kraken/Adrian and Diego acting as managers of Chantilly. Defendant had been in active communication with Adrian, requesting updates on the continued efforts to refinance and/or sell the Property. Defendant had also continued to rely on Kraken/Adrian and Diego to coordinate, pay, and manage maintenance

activities at the Property, marketing, realtor-client visits, and other responsibilities, further establishing that this was the status quo.

50. Plaintiffs are challenging the validity of Defendant's UCC sale of the Pledged Interests for several reasons, not the least being that it is the product of Defendant's breach of the Note and deficient notices of foreclosure.

51. On or about January 14, 2025, Defendant filed a Motion to Dismiss Chantilly's Chapter 11 bankruptcy. Defendant has used the Motion to Dismiss and their wrongful UCC takeover of Leviathan as a cudgel to prevent Plaintiffs from marketing and selling the Property through the Debtor-in-Possession bankruptcy, delaying any potential sale, causing further interests and costs to accrue, further eroding Plaintiffs' and Chantilly's equity, thus further damaging Plaintiffs and their ability to pay Chantilly's creditors.

52. Plaintiffs presented a motion to the Bankruptcy Court to hire a broker so the Property could be marketed and sold as fast as possible and with it pay its obligations including its unsecured creditors. Chantilly's unsecured creditors (the "Creditors") have joined on this motion to hire a broker, yet Defendant opposed the motion. Defendant's actions in doing so indicate that Defendant is seeking unjust enrichment in its attempt to fully own the Property with the intent to then foreclose it and dispossess all unsecured creditors and secured creditors that are in a lower position to Defendant. Defendant's foreclosure sale of its Deed of Trust is scheduled to occur on March 10, 2025.

53. On or about January 14, 2025, the same day that Defendant filed their Motion to Dismiss, Defendant breached the automatic stay of bankruptcy by seeking to illegally take control of the Property. Defendant hired a locksmith and instructed him to change the locks. The locksmith proceeded to drill out the deadbolts on the Property, causing material damage to the Property and making it more difficult to market/sell and maintain the Property. Because Defendant's representative and the locksmith forced their entry onto the Property, the alarm system recorded a break-in, and the Los Angeles Police Department responded to the incident.

54. There are myriad issues pertaining to the transactions, and Defendant's handling throughout has been fraught with issues. Defendant has breached the Loan in a manner that may make the Loan

usurious, presented inaccurate payoff amounts, presented defective notices of UCC foreclosure and Deed of Trust foreclosure, and likely made usurious and unconscionable Forbearances. For these reasons and others, Plaintiffs assert that Defendant's alleged UCC sale of the Pledged Interests and alleged takeover of Leviathan and Chantilly are void. Defendant should not be rewarded for their flagrant breach of the Loan and other predatory, fraudulent, and unconscionable behavior.

55.  In unlawfully collecting and seeking origination fees, interest rates, default interest rates, and forbearance fees in amounts far higher than allowed by the Note and by California law, Defendant caused Plaintiffs to lose significant economic opportunities that would otherwise have been available. But for the unlawful and usurious amounts charged by Defendant, Plaintiffs could have been able to obtain new financing, and the Chapter 11 bankruptcy case could have been avoided.

## FIRST CLAIM FOR RELIEF

### Defendant's Breach of Contract

56.  Plaintiffs incorporate by reference paragraphs 1 through 55 as though fully set forth herein.

57.  Defendant breached the Loan by charging, collecting, and seeking origination fees, interest, and default interest above what was negotiated and is stipulated in the Note.

58.  The Origination Fee stipulated in the Note was $117,500, amounting to 5% of the principal. The actual amount charged by Defendant through Escrow was $141,000, which amounts to 6% of the Loan Principal. This is shown in the Escrow Final Settlement Statement, as well as in Defendant's Loan Settlement Statement. Defendant thus collected an additional $23,500, constituting an additional 1% in origination fees.

59.  The maximum Interest Rate stipulated in the Note was 20% per annum, which over the term of the loan (November 20, 2023 through August 1, 2024) would have been approximately $328,743.17. The actual amount of interest collected by Defendant for the loan term was $403,547.22, which constitutes an effective interest rate of approximately 24.55% per annum. Defendant thus collected an additional $74,804.05 in interest, or an interest rate of approximately 4.55% above the maximum stipulated in the Note.

60. The maximum Default Interest Rate stipulated in the Note was 30% per annum. In the Payoff Letter provided by Defendant for an anticipated payoff date of November 25, 2024, Defendant claimed that the default interest accrued for the 117-day period of August 2, 2024 through November 25, 2024 came out to $271,555.63. Defendant is therefore seeking a default interest rate of approximately 36.05% per annum, or an interest rate of approximately 6.05% above the maximum stipulated in the Note.

61. These charges by Defendant above the maximum allowed by the Note and by California law add up to a significant amount and must be credited back to the Plaintiffs.

62. Because the combined balance that Defendant demanded to pay off the Loan included unlawful amounts and was therefore fraudulently inflated, Defendant's breaches may have prevented Plaintiff from refinancing the collateral.

63. In addition, these breaches raise serious questions as to the accuracy of the amount claimed by Defendant in the UCC foreclosure notices as well as the foreclosure notices on the Deed of Trust and provide evidence that the notices were deficient.

64. In addition, these breaches could cause the Defendant to be subject to fines and penalties and could cause the Loan to lose its usury exempt status, which would cause the Defendant to be subject to further penalties inclusive of treble damages.

65. Defendant's conduct in breaching the Loan in this manner was oppressive, fraudulent, and malicious.

### SECOND CLAIM FOR RELIEF

### Usury in Defendant's Breach of the Note

### (California Constitution, Article XV, Section 1; Civil Code Section 1916-1 et seq.)

66. Plaintiffs incorporate by reference paragraphs 1 through 65 as though fully set forth herein.

67. Defendant does not in any way qualify as a lender exempt from California usury laws. The cooperation of a licensed CA real estate broker was used to qualify the Loan for exemption.

68. The Loan as arranged between Plaintiffs and Defendant stipulated an Origination Fee of 5%, a maximum Interest Rate of 20%, and a maximum Default Interest Rate of 30%. These terms are confirmed in the Note.

69. In a flagrant breach of the Loan, Defendant instead charged origination fees of 6% and an interest rate of approximately 24.55% and is seeking accrued default interest rates calculated to be approximately 32.44% to 36.05% depending on the version of Defendant's payoff demand.

70. The amounts charged by Defendant do not reflect the terms of the Note and were not agreed to by Plaintiffs nor negotiated through a California licensed broker. Because the amounts charged significantly exceed the terms of the Note, the loan does not qualify for exemption from California usury laws.

71. Because interest and other fees are aggregated for the purposes of determining whether a loan is usurious, the functional interest rate of the Loan during the Loan term is 30.55%, which is usurious and in violation of the California Constitution, Article XV, Section 1. The maximum interest rate allowed by California law is 10%.

72. The penalty for a lender for receiving an usurious amount is not just forfeiting the interest exceeding the legislative or constitutional maximum but per *Harwick v. Wilcox*, 111 C.A. 5th 975 they are subject to forfeiting all interest paid throughout the duration of the transaction, in this case including the forbearance fees, origination fees, and regular and default interest.

73. Defendant's violation of California usury laws entitles Plaintiff to the following cumulative damages:

    a. Recovery of all past interest paid to Defendant;

    b. Recovery of three times the amount of all past interest paid to Defendant;

    c. A judgement canceling any obligation to pay any future interest that will come due, and;

    d. Punitive damages due to the oppressive and malicious nature of Defendant's conduct as evidenced by its pattern and practice of charging usurious interest rates.

74. Defendant's conduct in willfully collecting usurious amounts was oppressive, fraudulent, and malicious. Despite having used a California licensed real estate broker to qualify the loan for exemption and therefore evade California's usury laws, Defendant then chose to instead collect more than had been negotiated and is stipulated in the Note. Defendant's actions in doing so harmed Plaintiffs and intentionally breached the Loan in such a way that it was for all intents

and purposes no longer the same loan agreed to by Plaintiffs, thus causing the Loan to lose its usury exemption.

### THIRD CLAIM FOR RELIEF

### Usury and Breach of the Note in The Forbearances

75. Plaintiffs incorporate by reference paragraphs 1 through 74 as though fully set forth herein.

76. Between October 2, 2024 and December 4, 2024, Defendant arranged four separate Forbearance Agreements delaying the UCC foreclosure sale of the Pledged Interests, using the threat of UCC foreclosure as leverage to charge Plaintiffs usurious and unconscionable fees. The forbearances substantially modified the terms of the note while charging usurious fees and interest.

77. Over the two-month course of the Forbearances, Defendant demanded and collected from Plaintiffs $442,670 in fees, which equates to an interest rate of approximately 114.59% per annum.

78. At no point in the Loan were such fees discussed, negotiated, or agreed upon. By failing to use a California licensed real estate broker to negotiate and arrange the forbearance agreements, the Defendant fails to qualify the Forbearances for any sort of usury exemption per Cal. Civ. Code § 1916.1. The Forbearances were thus not subject to the Loan's exemption from California's usury law – the Loan's exemption being invalid regardless, due to Defendant's breach of the Loan as outlined above.

79. In addition to being usurious, the Forbearances breached the Note by materially changing the terms of the Loan. Defendant stipulated in the Forbearances that the Loan continued to accrue default interest at a per diem rate of $2,088.89. This constituted a rate of approximately 32.44% per annum, in breach of the maximum Default Interest Rate allowed per the Note of 30% per annum. Thus, this constitutes a further breach of the Loan.

80. By levying the additional forbearance fees while continuing to charge the default interest, Defendant effectively increased the interest rate of the Loan. Because interest and other fees are aggregated for the purposes of determining whether a loan is usurious, the functional interest rate of the Loan during the period of the Forbearances was 147.03% per annum, which is

usurious and in violation of the California Constitution, Article XV, Section 1. The maximum interest rate allowed by California law is 10%.

81. The penalty for a lender for receiving an usurious amount is not just forfeiting the interest exceeding the legislative or constitutional maximum but per *Harwick v. Wilcox*, 111 C.A. 5th 975 they are subject to forfeiting all interest paid throughout the duration of the transaction, in this case including the forbearance fees, origination fees, and regular and default interest.

82. Defendant's violation of California usury laws entitles Plaintiff to the following cumulative damages:

    a. Recovery of all fees and interest to Defendant;

    b. Recovery of three times the amount of all fees and interest to Defendant;

    c. A judgement canceling any obligation to pay any future interest that will come due, and;

    d. Punitive damages due to the oppressive and malicious nature of Defendant's conduct as evidenced by its pattern and practice of charging usurious interest rates.

83. Defendant's conduct in willfully collecting these usurious forbearance fees was oppressive and malicious, taking advantage of Plaintiffs distress and using their leverage over Plaintiffs to seek unjust enrichment.

## FOURTH CLAIM FOR RELIEF

### The Forbearances were Unconscionable

84. Plaintiffs incorporate by reference paragraphs 1 through 83 as though fully set forth herein.

85. In addition to, or separate from being usurious, the Forbearances are unconscionable in procedure and in substance.

86. Plaintiffs signed the Forbearances under extreme duress due to Defendant's threat of imminent UCC foreclosure on the Pledged Interests, feeling that they had no alternative. The Defendant was fully informed and aware that the Plaintiffs were in severe financial hardship yet charged exorbitant fees for the Forbearances.

87. These fees were disproportionate and only served to punish Plaintiffs and enrich Defendant, thus constituting an impermissible penalty and hidden interest.

88. It must be noted that the $442,670 in forbearance fees charged by the Creditor amounts to nearly 19% of the Loan principal. The forbearance fees did not follow any direct correlation between cost and time, instead appearing erratic and capricious. In fact, the Defendant demanded increasingly higher fees as the forbearance periods became shorter. In the Fourth Forbearance Agreement, Defendant demanded $125,000 for an additional 9 days of forbearance which amounts to a rate of 215% per annum. As Defendant continued to accrue the default interest, this was a total annualized rate for those 9 days of approximately 247.44%.

89. In addition, the terms of the forbearance agreements were expressly and intentionally disadvantageous to the Plaintiffs, including terms which sought to make Plaintiffs waive virtually all their rights as debtors, including waiver of automatic stay of bankruptcy.

90. Defendant is far more sophisticated and knowledgeable than Plaintiffs in these matters, as Plaintiffs are a family business focused on development of real estate while Defendant is a sophisticated firm and well-known industry expert specializing in complex lending and distressed real estate.

91. Unconscionability applies to all contracts, including contract provisions in relation to excessively high interest rates. Perdue, 38 Cal.3d at 927-929; Carboni, 2 Cal.App.4th 76 and more recently by the California Supreme Court in De La Torre v. CashCall, Inc., 5 Ca.5th 966 (2018).

92. Unconscionability doctrine is "meant to ensure that in circumstances indicating an absence of meaningful choice, contracts do not specify terms that are 'overly harsh', 'unduly oppressive,' or 'so one-sided as to shock the conscience.'" Id. at 982.

93. The fees and circumstances of the Forbearances are indeed "so one-sided as to shock the conscience". Because the Forbearance Agreements meet the requirements of unconscionability doctrine, the court could refuse to enforce the contract altogether or invalidate or limit any provision that the court may find unconscionable per Cal. Civ. Code Section 1670.5.

94. Plaintiffs are further entitled to exemplary and punitive damages.

### FIFTH CLAIM FOR RELIEF

### The Foreclosure Sale Notices are Deficient

95. Plaintiffs incorporate by reference paragraphs 1 through 94 as though fully set forth herein.

96. California Commercial Code § 9-613 specifies the required contents of a notification of disposition. The notification must provide "the amount of the obligation secured" and other required information. Defendant's incorrect calculation of origination points at 6% instead of 5%, interest at 24.55% rather than the contractual 20%, and default interest between 32.44% to 36.05% instead of the contractual 30% constitute defective notice under § 9-613, as it significantly misstates the amount of the obligation secured.

97. In *Backes v. Village Corner, Inc.* (1987) 197 Cal.App.3d 209,216, the court held that substantial compliance with notice requirements is necessary to properly conduct a foreclosure sale.

98. Defendant's UCC and deed of trust foreclosure sale notices improperly reflect the Plaintiffs' obligations of the debt secured, reflecting an inflated amount due to Defendant's various breaches as outlined above. As such, Defendant's notices are deficient and thus invalid.

99. Because the UCC foreclosure sale of the Pledged Interests was executed based on deficient notices, the sale is not valid and should be declared void. In addition, Defendant's notice of foreclosure sale of the Deed of Trust set for March 10, 2024 is also deficient and invalid and should be declared void.

### SIXTH CLAIM FOR RELIEF

### Fraud in the Execution

100. Plaintiffs incorporate by reference paragraphs 1 through 99 as though fully set forth herein.

101. California recognizes fraud in the execution (or fraud in the inception) where a party is deceived as to the nature of the document being signed. (*Brown v. Wells Fargo Bank, NA.* (2008) 168 Cal.App.4th 938, 958.) This is applicable here because while Plaintiffs were emailed lengthy word documents, they were told the documents were being revised so what was sent prior to the signing of the signature pages was in fact not relevant. Even more important in this case is that no one apart from Defendant had the final loan documents and they could easily have changed said documents at any time.

102. This is not to be accusatory in this case, however, in at least one of the most critical documents, the Pledged Interests, we know for a fact that the document was altered: In support of their

Motion to Dismiss, Defendant submitted two versions of the Pledged Interests. The first version did not have the actual calendar date of execution inserted in the terms, having instead a blank space after November. In the second version, someone clearly altered it as compared to the first since the calendar date of execution now read November 20th, thereby changing the date on an already signed document.

103. Both versions were sworn by David Blatt in his declaration supporting Defendant's motion to dismiss Chantilly's chapter 11 bankruptcy to be "a true and correct copy" of the document. It may just be the date, but in many cases the dates are important. Because Plaintiffs signed and notarized the signature pages on November 16, 2023, there is no question that the document reading November 20th is not what is claims.

104. The elements of fraud in the execution are: (1) misrepresentation of the character of the writing, (2) justifiable reliance, and (3) no negligence in failing to discover the true nature of the document. (*Rosenthal*, supra, 14 Cal.4th at p. 420.). Defendant's representation that complete documents would be provided later, coupled with only providing signature pages for immediate execution, constitutes fraud in the execution rendering the Pledged Interests void.

105. The Pledged Interest being void, the foreclosure sale of said Pledged Interest is invalid and should be declared void.

### SEVENTH CLAIM FOR RELIEF

### The Pledge Agreement is Unenforceable due to Lack of Mutual Assent

106. Plaintiffs incorporate by reference paragraphs 1 through 105 as though fully set forth herein.

107. As described above, the first time that Plaintiffs were able to see a complete set of the executed loan documents was within Defendant's exhibits in their Motion to Dismiss the Chapter 11 bankruptcy. On November 17, 2023, Defendant's counsel stated in writing that they required the original copies of Plaintiffs signed and notarized signature pages before funding the loan, and that they would only have the final loan documents on the date of closing. Plaintiffs had already signed and notarized the signature pages on November 16, 2023 and sent the package to Escrow and Title. This implied that any loan documents Plaintiffs could have reviewed prior to

signing were not the final loan documents, and that Defendant could change the documents at will after Plaintiff had signed and notarized their signature pages.

108. Under California law, a valid contract requires mutual assent to the same terms. (Civ. Code§ 1550; *Weddington Productions, Inc. v. Flick* (1998) 60 Cal.App.4th 793, 811.) Where, as here, a party is induced to sign document pages without being provided the full agreement, the party does not truly know what the terms are they are agreeing to.

109. In this case, as evidenced by the significant breaches by Defendant of the terms of the Note, there clearly was no meeting of the minds as the Plaintiffs did not have access to the final Loan terms to agree or not. Thus, the entire Loan and in particular the Pledged Interests are not a valid and enforceable contract and the UCC sale was not valid. In *Stewart v. Preston Pipeline Inc.* (2005) 134 Cal.App.4th 1565, 1587, the court likewise held that "an essential element of any contract is the consent of the parties, or mutual assent." In that case, the Plaintiff, like the Plaintiffs herein, could not have assented to terms that were never fully disclosed or could have been altered after signing.

110. In addition, the California Supreme Court in *Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 419, recognized that when a party is prevented from knowing the true nature of what they are signing, the agreement is voidable. This is particularly pertinent herein as Defendant, with sole access to the lengthy agreements, merely sent signature pages for the Plaintiffs to sign without any actual documents. The fact that the signature pages were all the Debtor parties received establishes there were no real agreements as to the actual terms. Thus, the UCC sale was invalid since the Loan was not a valid contract.

### EIGHTH CLAIM FOR RELIEF

### The UCC Sale Failed to Comply with Commercial Reasonableness Requirements

111. Plaintiffs incorporate by reference paragraphs 1 through 110 as though fully set forth herein.

112. California Commercial Code§ 9-610(b) pertains to a UCC sale and requires that "[e]very aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable." Emphasis added.

113. In *Ford & Vlahos v. ITT Commercial Finance Corp.* (1994) 8 Cal.4th 1220, 1232, the California Supreme Court emphasized that a secured party must act in good faith and in a commercially reasonable manner when disposing of collateral. In this case, there are serious issues as to the actual amount owed which was provided in the Notice of the UCC Sale. The Defendant's breach of the Note and subsequent discrepancy in the fees, interest rate, and default interest rate used to calculate the notice of sale renders the sale commercially unreasonable as it is a defective notice and misstates the amount owed, potentially chilling bidding.

114. California Commercial Code § 9-625(a) provides that if a secured party fails to comply with Article 9, the court may order or restrain collection, enforcement, or disposition of collateral "on appropriate terms and conditions." See *In re Sunshine Trading & Transportation Co.*, 193 B.R. 752.) In addition, Courts have inherent equitable power to void UCC sales that fail to meet commercial reasonableness requirements. *Ford & Vlahos v. ITT Commercial Finance Corp.* (1994) 8 Cal.4th 1220, 1232.)

115. In this case, the acts of changing the date on the undated execution of the Pledged Interests and create fundamental defects that render the entire transaction void. A sale based on void security documents cannot be commercially reasonable. See *Sierra Financial Corp. v. Brooks-Farrer Co.* (1971) 15 Cal.App.3d 698.) The Court should declare the sale void ab initio due to the multiple material defects in the sale process.

### NINTH CLAIM FOR RELIEF

### Defendant is not Registered to Conduct Business in California

116. Plaintiffs incorporate by reference paragraphs 1 through 115 as though fully set forth herein.

117. Under California Corporations Code, a business organized as a Limited Liability Company ("LLC") outside of California is a foreign LLC. If a foreign corporation or LLC is transacting business in California, it must register the business with the California Secretary of State. Cal. Corp Code, §§ 17451, 17708.07. Once a foreign business is registered it has the right to transact business in this state and enter into valid contracts with other entities. Cal. Corp. Code §§17456. The foreign LLC must file tax returns and pay taxes just like a California entity and is subject to

penalties for failure to file tax returns and reports in California. Cal. Rev. & Tax Code §§ 23301, 23301.5, 23775.

118. A foreign company that fails to register in California forfeits all "corporate powers, rights and privileges" in California including the right to maintain a lawsuit in the state. Cal. Corp. Code §§ 2105, 2203, 17456; *Neogard Corp. v. Malott & Peterson-Gundy*, 106 Cal.App.3d 213, 219-220 (1980). In fact, according to California Revenue & Tax Code Section 23304.1 (b):

> If a foreign taxpayer that neither is qualified to do business nor has an account number from the Franchise Tax Board, fails to file a tax return required under this part, any contract made in this state by that taxpayer during the applicable period specified in subdivision (c) shall, subject to Section 23304.5, be voidable at the request of any party to the contract other than the taxpayer.

119. Since Defendant completed a transaction under California law affecting a California company and Property and a UCC sale was completed, permitting Defendant to correct its registration error is not warranted. Defendant has already used the processes in California to its benefit by filing the UCC statement and then used the California system to the detriment of a registered rightful California entity. Plaintiffs request the court to void the sale in its entirety as Defendant was not properly registered in California nor entitled to transact business in the State. Cal. Rev. & Tax Code, § 23304.l(b)

## TENTH CLAIM FOR RELIEF

### Intentional Interference with Prospective Economic Advantage

120. Plaintiffs incorporate by reference paragraphs 1 through 119 as though fully set forth herein.

121. Defendant is falsely claiming it has the authority over Leviathan and Chantilly due to its UCC sale of the Pledged Interests and that Plaintiffs did not have the authority to enter Chantilly into the voluntary Chapter 11 bankruptcy petition. Defendant's UCC sale of the Pledged Interests is void for several reasons as described in this complaint. With the sale being void, Defendants have no authority over Leviathan or Chantilly. Plaintiffs assert that the Owners retain ownership of Leviathan, and that Kraken remains Chantilly's sole manager, and therefore Adrian and Diego Rudomin as managers of Kraken were and are authorized to act on behalf of Chantilly.

122. Defendant has used its claim of authority to act on behalf of Chantilly and its Motion to Dismiss as a cudgel to prevent Plaintiffs from marketing and selling the Property through the Debtor-in-Possession bankruptcy, damaging Plaintiffs' ability to pay Chantilly's creditors.

123. Chantilly's unsecured creditors (the "Creditors") have joined on Chantilly's motion to hire a broker, yet Defendant opposed the motion seeking unjust enrichment by attempting to own the Property outright and foreclose on it, with it wiping out and dispossessing all unsecured creditors and secured creditors in a lower position than Defendant.

124. Defendant has actively interfered with the proper function of the Property and the course of Plaintiffs' business. Defendant violated the automatic stay and hired locksmiths who physically damaged several of the entry locks causing hardship for vendors, maintenance personnel, etc., to access the Property.

125. Defendant's actions may have also influenced the staging company's decision to remove the staging furniture from the Property, significantly decreasing the impact when showing the Property to potential buyers. Defendant's actions have demonstrably impacted Plaintiffs' ability to market and sell the Property, preventing its proper maintenance, and potentially diminishing the Property's value.

126. Defendant has actively harassed and intimidated Chantilly's sales agents through abusive phone calls and legal threats, thus deterring them from representing, showing and securing potential buyers for the Property. These actions are particularly detrimental as it has prevented marketing the Property during a significant swell of activity in the luxury market due to people looking for properties after the Palisades fire.

127. With its actions Defendant is causing Chantilly's debt to unnecessarily increase as default interest continues to accrue from the First and Defendant's Loan, and legal and deferred maintenance costs also continue to accrue. These increases in costs and debt have further eroded Chantilly's equity, damaging Plaintiffs, Chantilly and its creditors and causing significant financial and reputational harm to Plaintiffs.

128. Defendant is using undue influence in the bankruptcy proceedings to manipulate and interfere with the status quo, thus irreversibly damaging Plaintiffs and Chantilly's creditors. Allowing

Defendant's Motion to Dismiss to proceed would cause further irreversible and irremediable material damaged to Plaintiffs and Chantilly's creditors.

### ELEVENTH CLAIM FOR RELIEF

### Declaratory Relief

129. Plaintiffs incorporate by reference paragraphs 1 through 128 as though fully set forth herein.

130. Plaintiffs are informed and believe, and thereon allege, that an actual controversy has arisen and now exists between Plaintiffs, on the one hand, and Defendant, on the other hand, as set forth herein. A judicial declaration is necessary and appropriate at this time.

131. Plaintiffs seek a judicial declaration that: Defendant's Motion to Dismiss Chantilly from Chapter 11 bankruptcy is denied; The usurious interest rate provisions in the Loan and Forbearances are void; The Forbearances are unlawful and unenforceable due to Defendant's breach of the Loan and failure to use a California licensed broker; The alleged UCC sale of the Pledged Interests is void; and Plaintiffs retain their statutory protections despite the waiver provisions in the agreements.

132. Accordingly, Plaintiffs seek a Temporary Restraining Order and Preliminary Injunction Enjoining Defendant from: Managing, controlling, or operating Chantilly and Leviathan, Interfering with Plaintiffs' business, including the property owned by Chantilly; Conducting any further auctions or sales of Plaintiffs' collateral; and enforcing any provisions of the agreements found to be unlawful or void; for compensatory damages according to proof, including lost assets and financial harm; and for such other and further relief and fees and costs as this Court may deem necessary and proper.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendant as follows:

1. Under the First Claim for Relief

    a. For restitution and disgorgement of all payments made under the Loan;

    b. For compensatory damages;

    c. For punitive damages and exemplary damages, and;

    d. For such other and further relief, fees, and costs as this Court may deem just and proper.

2. <u>Under the Second Claim for Relief</u>

    a.  For recovery of all interest and fees to Defendant;

    b.  For recovery of three times the amount of all payments made to Defendant;

    c.  For judgement canceling any obligation to pay any future interest that will come due;

    d.  For punitive damages and exemplary damages;

    e.  For statutory penalties for Defendant's violation of California usury laws, and;

    f.  For such other and further relief, fees, and costs as this Court may deem just and proper.

3. <u>Under the Third Claim for Relief</u>

    a.  For recovery of all past Forbearance fees paid to Defendant;

    b.  For recovery of three times the amount of the Forbearance fees paid to Defendant;

    c.  For judgement canceling any obligation to pay any future interest that will come due;

    d.  For punitive damages and exemplary damages;

    e.  For statutory penalties for Defendant's violation of California usury laws, and;

    f.  For such other and further relief, fees, and costs as this Court may deem just and proper.

4. <u>Under the Fourth Claim for Relief</u>

    a.  For the court to refuse to enforce the Forbearances altogether or invalidate or limit any provision that the court may find unconscionable;

    b.  For punitive damages and exemplary damages;

    c.  For a declaration that the usurious interest rate provisions are void;

    d.  For a judicial declaration that the Forbearances are unlawful and unenforceable due to Defendant's failure to use a California licensed broker; and that Plaintiffs retain their statutory protections despite the waiver provisions in the Forbearances, and;

    e.  For such other and further relief, fees, and costs as this Court may deem necessary and proper.

5. <u>Under the Fifth Claim for Relief</u>

    a.  For a judicial declaration that Defendant's Notices of UCC foreclosure sale and Deed of Trust foreclosure sale are deficient and void.

b. For a judicial declaration that Defendant's alleged UCC foreclosure sale of the Pledged Interests is void.

6. <u>Under the Sixth Claim for Relief</u>

a. For the Court to declare the Loan inclusive of the Pledged Interests void due to Defendant's fraud in the execution.

7. <u>Under the Seventh Claim for Relief</u>

a. For the Court to declare the Loan inclusive of the Pledged Interests void due to lack of mutual assent.

8. <u>Under the Eighth Claim for Relief</u>

a. For the Court to void Defendant's alleged UCC foreclosure sale of the Pledged Interests due to Defendant's failure to comply with commercial reasonableness requirements.

9. <u>Under the Ninth Claim for Relief</u>

a. For a judicial declaration that Defendant forfeits all "corporate powers, rights and privileges" in California including the right to maintain a lawsuit in the state;

b. For the court to void the alleged UCC sale in its entirety as Defendant was not properly registered in California nor entitled to transact business in the State.

10. <u>Under the Tenth Claim for Relief</u>

a. For a judicial declaration denying Defendant's Motion to Dismiss Chantilly from Chapter 11 bankruptcy;

b. For restitution of all costs accrued by Plaintiffs due to Defendant's interference with the marketing and sale of the Property;

c. For compensatory damages to be determined by the Court for Defendant's impact on Plaintiffs' ability to market, sell, and operate the Property;

11. <u>Under the Eleventh Claim for Relief</u>

a. For a judicial declaration denying Defendant's Motion to Dismiss Chantilly from Chapter 11 bankruptcy;

b. For a temporary restraining order and preliminary injunction enjoining Defendant from: Managing, controlling, or operating Chantilly and Leviathan; Interfering with Plaintiffs'

1  business including the Property; Conducting any further auctions or sales of Plaintiffs'

2  collateral; and enforcing any provisions of the agreements found to be unlawful or void;

3     c. For a judicial declaration declaring the alleged UCC sale of the Pledged Interests void.

4     d. For a judicial declaration that: the usurious interest rate provisions and other usurious

5  fees in the Loan and Forbearances are void; the Forbearances are unlawful and

6  unenforceable due to Defendant's breach of the Loan and failure to use a California

7  licensed broker; and Plaintiffs retain their statutory protections despite the waiver

8  provisions in the agreements;

9     e. For compensatory damages, including lost assets and financial harm, and;

10    f. For such other and further relief, fees, and costs as this Court may deem just and proper.

11 12. Under All Claims for Relief

12    a. For recovery of any and all damages, in an amount to be determined by the Court;

13    b. For compensatory damages;

14    c. For punitive and exemplary damages;

15    d. For reasonable attorney's fees and costs of suit; and

16    e. For such other and further relief, fees, and costs as the Court deems just and proper.

17 Dated: March 04, 2025                              Totaro & Shanahan, LLP

20                                     _____

21                                     By /s/ Maureen J. Shanahan
Maureen J. Shanahan
Attorneys for Plaintiffs

23                                     Simone and Roos, LLP

26                                     By Martin Simone, ESQ.
Attorneys for Plaintiffs